J-S24001-16

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P. 65.37**

IN RE:  C.A.J., a Minor                    :        IN THE SUPERIOR COURT OF
                                           :              PENNSYLVANIA
                                           :
                                           :
                                           :
                                           :
                                           :
APPEAL OF:  R.J. and T.J.                  :        No. 1843 MDA 2015

Appeal from the Decrees entered September 24, 2015
in the Court of Common Pleas of Berks County,
Orphans' Court Division, No(s): 84255

BEFORE:  GANTMAN, P.J., BOWES and MUSMANNO, JJ.

MEMORANDUM BY MUSMANNO, J.:                          **FILED MAY 06, 2016**

R.J. ("Father")[1] and T.J. ("Mother") (collectively, "Parents") appeal from the Decrees granting the Petitions filed by the Berks County Children and Youth Services ("CYS" or the "Agency") to involuntarily terminate their parental rights to their minor child, C.A.J., a male born in June 2014, ("Child"), pursuant to the Adoption Act, 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b).[2]  We affirm.

Previously, on December 9, 2013, the trial court terminated the parental rights of Parents to their older son, T.J., born in February 2013, under section 2511(a)(2) and (b).  That same date, the trial court also

---

[1] Arizona criminal records indicate that in 2000, Father pled guilty to five counts of attempted sexual assault of a minor (under the age of 14).  Father was sentenced to ten years in prison, and was released from prison in March 2009.  Father is a lifetime sex offender registrant under Megan's Law.

[2] On September 24, 2015, the trial court also involuntarily terminated the parental rights of any unknown father of Child.  No individual claiming to be the putative father has filed an appeal.

terminated the parental rights of Mother to her son, M.Y.,[3] born in April 2008, under section 2511(a)(1) and (b). This Court affirmed the termination of Parents' parental rights as to T.J., agreeing with the trial court's finding that despite CYS's offer to pay for non-offender treatment for Mother and sex offender treatment for Father, neither parent took advantage of the opportunity to obtain those services and move toward reunification with T.J. *See In re T.J.*, 105 A.3d 801 (Pa. Super. 2014) (unpublished memorandum at 10). This Court also affirmed the termination of Mother's parental rights as to M.Y. based on her failure to comply with court-ordered treatment, and her inability to provide a safe environment to fulfill the needs of M.Y. *See id*. (unpublished memorandum at 12-13).

Mother gave birth to Child in June 2014. On June 10, 2015, CYS filed separate Petitions seeking to involuntarily terminate the parental rights of Parents to Child, pursuant to section 2511(a)(1), (2), (5), (8), and (b). Also on June 10, 2015, CYS filed a Petition seeking to involuntarily terminate the parental rights of Mother and any unknown father of Child, pursuant to section 2511(a)(1), (2), and (b).[4]

On September 18, 2015, the trial court held a hearing on the termination Petitions. CYS presented the testimony of Richard Frederick

---

[3] Father is the stepfather of M.Y.

[4] Parents previously filed an appeal from an Order in this matter, at Docket No. 1466 MDA 2015, relating to the scheduling of the hearing on the Petitions. They discontinued the appeal on October 21, 2015.

Small, Ph.D. ("Dr. Small"), as an expert in psychological evaluations and psychology. N.T., 9/18/15, at 6. Dr. Small opined that Mother would be unlikely to protect or nuture a child in her care. *Id.* at 9. Dr. Small further testified that Mother's visits with Child were inconsistent, and that she lacked motivation or commitment to bond with Child. *Id.* at 21. Dr. Small opined that Mother is overwhelmed, and easily dominated, so that her protective instinct toward her children is overwhelmed by Father. *Id.* Dr. Small testified that Mother did not show any concern or regret that her two older children, T.J., and M.Y., had been adopted, and that she did show any recognition of mistakes on her part. *Id.* at 22-23.

Dr. Small also opined that Father had a long history of committing sexual abuse, for which Father had served time in prison, and that Father did not express any emotion or empathy toward his stepsiblings that he had abused, which is the hallmark of an antisocial personality. *Id.* at 12. Dr. Small stated that it would be highly unlikely that Father would improve with additional treatment or services. *Id.* at 13. While Dr. Small could not opine with any degree of certainty that Father is a sexual danger to a young child, Dr. Small was concerned about Father's unwillingness to put the needs of others above his own, particularly those of a young child. *Id.* at 15. Dr. Small indicated that Parents have a pathological relationship that is complementary, and that Father easily manipulates Mother. *Id.* at 21.

CYS then presented the testimony of Sarah Albright ("Albright"), a licensed professional counselor, who is qualified in sexual offender evaluation and treatment, and domestic violence evaluation and treatment. *Id.* at 23-24. Albright testified that Father was unsuccessfully discharged from psychosexual evaluation and treatment for noncompliance, and that he had been deceitful about his history. *Id.* at 25-29. Albright testified that Father's lack of willingness to attend treatment and accept responsibility for his actions demonstrated his lack of motivation to change. *Id.* at 29, 34. Albright opined that Father's lack of empathy toward stepsiblings that he had abused increased the risk that he would be a re-offender, because he does not care if he harms someone. *Id.* at 31. Based on Father's failure to complete an evaluation and treatment related to his history, Albright opined that Father should have no contact with Child pending Father's completion of a full evaluation. *Id.* at 29-30. Further, Albright believes that Father appears to be a risk to prepubescent individuals, but she would need to conduct a therapeutic polygraph examination to render an opinion. *Id.* at 33, 34-35.

Next, CYS presented the testimony of Julie Karaisz ("Karaisz"), who is a licensed social worker who works with children, adolescents, and families in Berks County, and an expert in the area of diagnosing domestic violence and "non-offending" treatment. *Id.* at 36-37. Karaisz testified that Mother had attended eight one-hour non-offending parent individual sessions,

between April 5, 2015, and July 8, 2015. *Id.* at 37-38. During these sessions, Mother defended Father, and refused to acknowledge that he is a sex offender. *Id.* at 38, 48-49. Mother has refused to separate herself from him or acknowledge that he could be a threat to her or her children. *Id.* at 38, 50. After July 8, 2015, Mother reported that she did not have transportation or resources to attend treatment, and she was unsuccessfully discharged. *Id.* Karaisz opined that, based on the eight sessions, Mother is very resistant to understanding the risk that Father poses to her children because Mother is very vulnerable and defensive about Father's criminal history. *Id.* at 38-39; *see also id.* at 50-51 (wherein Karaisz testified that Mother lacks a willingness to even hear that she and her children are vulnerable to Father, because Mother believes what Father tells her). Karaisz stated that Mother has difficulty recognizing safe boundaries, and a lack of insight on how to protect herself and any child in her care. *Id.* at 39.

CYS then presented the testimony of Carla Sanders ("Sanders"), who is an adoption supervisor at CYS, and is assigned to Child's case. *Id.* at 53. Sanders testified that she became involved with the family on January 30, 2013, when Father moved into Mother's home, and there were concerns about M.J. *Id.* at 55. Mother then gave birth to T.J. *Id.* After the parental rights as to M.J. and T.J. had been terminated, CYS discovered that Mother had given birth to Child in June 2014, and CYS again became involved with the family. *Id.* at 55-56. As CYS was concerned that Parents had not

remedied any of the prior issues, it sought and received emergency custody of Child, and placed Child in foster care with T.J. and M.Y. *Id.* at 56.

Sanders explained that Parents had resided with Mother's family members in Fleetwood, Berks County. *Id.* at 57-58. The entire household later moved to Schuylkill County, where they currently reside, because the rent was less expensive. *Id.* at 58. Sanders testified that, with regard to reporting stable housing and maintaining appropriate income, Parents have notified the Agency of any changes in their income and residence. *Id.* at 68. Parents also have reported to the Agency that, at around the time of Child's birth, Father was working at a donut shop, but quit when they moved to Schuylkill County. *Id.* at 58, 69. Mother was working at a produce store for two months, but also quit. *Id.* at 64, 69. Parents are presently unemployed. *Id.* at 58, 69.

Parents were informed that it would be difficult to maintain contact and cooperate with CYS services if they moved away from Berks County. *Id.* at 58-59. As Parents indicated that transportation was a problem, CYS provided transportation once a month for visits, the non-offending parent evaluation, and domestic violence treatment. *Id.* at 59; *see also id.* at 56-57 (wherein Sanders stated that prior to July 1, 2015, CYS provided transportation for one visit, and Mother provided transportation for the second visit each month). The majority of the cooperation by Parents occurred when CYS provided transportation. *Id.* at 59; *see also id.* at 57

(stating that after July 1, 2015, when CYS terminated the transportation, Mother has attended four visits with Child).

Mother attended a total of twenty-five visits with Child since the start of the case. *Id.* at 56; *see also id.* at 65 (wherein Sanders states that Mother missed a number of visits with Child). Mother needed prompting on basic care for Child, who was calm, and there were no major concerns. *Id.* at 56, 70. Father's only contact with Child was in the hospital, before Child's placement in foster care, as his visits were suspended. *Id.* at 56-57; *see also id.* at 67 (wherein Sanders stated that the trial court ordered that Father was to have no visitation with Child because he has not completed sexual offender treatment to demonstrate that he poses no risk to Child).

Sanders testified that Mother cooperated with parenting education, and attended the program at Open Door between August 7, 2014, and October 16, 2014. *Id.* at 60. At sessions, Mother was reportedly engaged, but was timid in her responses. *Id.* Mother also eventually cooperated with a mental health evaluation conducted by Dr. Small. *Id.* at 60-61. Mother had engaged in individual therapy, in Schuylkill County, regarding domestic violence, pursuant to Dr. Small's recommendation. *Id.* at 61, 67. She participated in an educational program regarding domestic violence, but did not agree to participate in the Commonwealth Clinical Group for domestic violence training, nor did she agree to participate in an evaluation of what she had learned from the domestic violence training at Open Door. *Id.*; *see*

***also id.*** at 70-71 (wherein Sanders testified that the Agency had offered to cover the expense of an evaluation to determine whether Parents had learned anything, and to determine the risk they posed for Child, but did not receive a response). Mother attended individual counseling, and Parents attended some marriage counseling sessions, but they did not attend on a regular basis. ***Id.*** at 63. Parents participated in casework services and recommendations with regard to Child with the caseworker, Jeni Dudash ("Dudash"), on several occasions. ***Id.*** at 64. Mother cooperated with non-offending parenting evaluations. ***Id.*** at 63-64.

Father attended parenting education at Open Door with Mother. ***Id.*** at 65-66. Father had a mental health evaluation by Dr. Small, but refused to engage in recommended therapy. ***Id.*** at 66. Father participated in the same domestic violence program as Mother. ***Id.*** While Father completed the educational session regarding domestic violence, he did not follow through with an evaluation of what he had learned. ***Id.*** at 66, 70-71. Father has not completed a sexual offender treatment program during his involvement with the Agency. ***Id.*** at 67, 69-70. Father indicated that he has not participated in a sex offender treatment program because he lacks the funds to pay for it. ***Id.*** at 67. Father has attended a casework services session with Dudash and Christine Yuhasz. ***Id.*** Sanders explained that, after July 1, 2015, the Agency had no contact with Parents. ***Id.*** at 65. There was no bonding evaluation performed concerning Parents. ***Id.*** at 67.

Sanders testified that Child is doing well in his foster home, and he appears to be very bonded with the foster family, to whom he looks for all of his needs. *Id.* at 56. Child smiles at his foster parents, and appears to be bonded with the other children placed in the home. *Id.* Sanders testified that CYS has no concern of any detriment to Child from the termination of Parents' parental rights. *Id.* at 57-58. Sanders testified that Child's foster family is the only family that he knows, so it would be harmful for him to be removed from that situation and placed with people he does not know. *Id.* Sanders stated that there are no concerns noted at the end of visits regarding Child's ability to separate from Mother. *Id.* Sanders testified that Parents have not made any progress toward remediating the issues that necessitated placement of Child or recognizing the issues. *Id.* at 59.

On September 24, 2015, the trial court entered its Decrees involuntarily terminating the parental rights of Mother, Father, and the unknown father, finding that CYS established the facts alleged in the Petitions by clear and convincing evidence.

On October 23, 2015, Parents timely filed a Notice of Appeal along with a Concise Statement of Errors Complained of on Appeal pursuant to

Pa.R.A.P. 1925(a)(2)(i) and (b).[5]

On appeal, Parents raise the following questions for this Court's review:

1. Did the Honorable Trial Court err in ruling that terminating parental rights was proper in this case?

2. Has a Due Process violation occurred since Father was required to complete certain sexual offender services as a prerequisite to reunification or even visitation with [C]hild, yet the Agency or [c]ourt never permitted funding for such services?

Brief for Parents at 2-3.

We review an appeal from the termination of parental rights in accordance with the following standards:

[O]ur scope of review is comprehensive: we consider all the evidence presented as well as the trial court's factual findings and legal conclusions. However, our standard of review is narrow: we will reverse the trial court's order only if we conclude that the trial court abused its discretion, made an error of law, or lacked competent evidence to support its findings. The trial judge's decision is entitled to the same deference as a jury verdict.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

_____

[5] Despite the trial court's entry of separate Decrees terminating Parents' parental rights, Parents filed a single Notice of Appeal from the Decrees. Although filing one appeal from separate orders is generally discouraged, Parents' arguments regarding each Decree are identical and arise from the same set of facts. *See Baker v. Baker*, 624 A.2d 655, 656 (Pa. Super. 1993) (considering an appeal from separate orders where appellant's arguments were identical and stemmed from the same factual precedent). Additionally, the trial court issued one Opinion to address both Decrees. *See Dong Yuan Chen v. Saidi*, 100 A.3d 587, 589 n.1 (Pa. Super. 2014) (stating that an appeal from two separate orders was not fatal where the trial court addressed the issues pertaining to both orders). Therefore, under these circumstances, we will address Parents' appeal.

Termination of parental rights is controlled by section 2511 of the Adoption Act. *See* 23 Pa.C.S.A. § 2511. The burden rests upon the petitioner "to prove by clear and convincing evidence that its asserted grounds for seeking the termination of parental rights are valid." ***In re R.N.J.***, 985 A.2d 273, 276 (Pa. Super. 2009). "[C]lear and convincing evidence is defined as testimony that is so clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." ***Id.*** (citation and quotation marks omitted). Further, the "trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence." ***In re M.G.***, 855 A.2d 68, 73-74 (Pa. Super. 2004). If the competent evidence supports the trial court's findings, "we will affirm even if the record could also support the opposite result." ***In re Adoption of T.B.B.***, 835 A.2d 387, 394 (Pa. Super. 2003).

Satisfaction of any one subsection of Section 2511(a), along with consideration of Section 2511(b), is sufficient for the involuntary termination of parental rights. ***In re B.L.W.***, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). In this case, we will review the trial court's decision to terminate Parents' parental rights based upon Section 2511(a)(2) and (b), which state the following:

**§ 2511. Grounds for involuntary termination**

**(a) General rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

* * *

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

* * *

**(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2), (b).

In order to terminate parental rights pursuant to 23 Pa.C.S.A § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

***In re Adoption of M.E.P.***, 825 A.2d 1266, 1272 (Pa. Super. 2003).

Section 2511(a)(2) "does not emphasize a parent's refusal or failure to perform parental duties, but instead emphasizes the child's present and

future need for essential parental care, control or subsistence necessary for his physical or mental well-being." *In re A.S.*, 11 A.3d 473, 481 (Pa. Super. 2010).

Regarding section 2511(b), the trial court inquires whether the termination of Parents' parental rights would best serve the developmental, physical and emotional needs and welfare of the child. *See In re C.M.S.*, 884 A.2d 1284, 1286-87 (Pa. Super. 2005); *see also In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013). "Intangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." *In re C.M.S.*, 884 A.2d at 1287 (citation omitted). The court must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond. *Id*. Additionally, "the strength of emotional bond between a child and a potential adoptive parent is an important consideration in a 'best interests' analysis." *In re I.J.*, 972 A.2d 5, 13 (Pa. Super. 2009). In conducting a bonding analysis, the court is not required to use expert testimony, but may rely on the testimony of social workers and caseworkers. *In re Z.P.*, 994 A.2d 1108, 1121 (Pa. Super. 2010). Finally, although the focus in terminating parental rights under section 2511(a) is on the parent, it is on the child under section 2511(b). *In re Adoption of C.L.G.*, 956 A.2d 999, 1008 (Pa. Super. 2008) (*en banc*); *see also In re Z.P.*, 994 A.2d at 1125 (stating

that, a child's life "simply cannot be put on hold in the hope that [a parent] will summon the ability to handle the responsibilities of parenting.").

Parents contend that CYS failed to meet its burden of establishing that they had a settled purpose of relinquishing their parental rights, and have refused or failed to perform their parental duties. *See* Brief for Parents at 5-10. Parents argue that Mother had been attending visitations with Child, and that she had cooperated with the trial court's requirements to attend a mental health evaluation, domestic violence training, and parenting classes. *Id.* at 7, 9. Parents further argue that Father participated in parenting education, mental health evaluations, domestic violence training, and marriage counseling. *Id.* at 7-8. Parents claim that Father could not complete his sex offender evaluation requirements due to a lack of funding, and that his criminal history and registration under Megan's Law was the only condition that he could not remedy. *Id.* at 8. Parents assert that Father was not permitted to have visitation with Child because of a requirement imposed during the prior termination proceedings concerning the two older children. *Id.* at 9. Parents allege that they wanted to cooperate with CYS so that the court would not terminate their parental rights to Child. *Id.* at 9-10.

Here, the trial court's determination that Parents have evidenced a repeated and continued incapacity, abuse, neglect or refusal that has caused Child to be without essential parental care, control or subsistence necessary

for his physical or mental well-being, and that the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by Parents is supported by competent, clear and convincing evidence in the record. The trial court noted that Parents' issues with regard to the termination of M.Y. and T.J. were ongoing, and Parents do not have the ability to remedy the conditions. Trial Court Opinion, 11/17/15, at 2. Further, the trial court found that "Mother's moderate compliance with court-ordered services did not establish her ability to protect [C]hild from harm[,]" and "Father's minimal compliance with sex offender evaluation and treatment continues to present a grave risk to [C]hild." *Id.* We, therefore, find no abuse of the trial court's discretion in terminating the parental rights of Parents under section 2511(a)(2) and (b).

Additionally, the trial court's determination that Parents cannot provide for Child's needs and welfare, and that his best interests are served by the termination of their parental rights, is also supported by competent, clear and convincing evidence in the record. Indeed, the trial court's determination that there is no bond between Child and Parents, and that Child would not suffer any harm from the termination of their parental rights is supported by competent, clear and convincing evidence. *See K.Z.S.*, 946 A.2d 753, 762-63 (Pa. Super. 2008) (stating that "where there is no evidence of any bond between parent and child, it is reasonable to infer no bond exists"). Moreover, CYS presented evidence that Child has bonded

- 15 -

with his foster parents and that they best serve his welfare interests.  *See In re P.Z.*, 113 A.3d 840, 852 (Pa. Super. 2015) (stating that termination of parental rights best served the child's needs and welfare where a supportive and secure environment existed with a new family); *see also In re J.L.C.*, 837 A.2d 1247, 1250 (Pa. Super. 2003) (stating that termination of parental rights is proper where the child has formed a bond with the foster parents, and where the child has lived with the foster parents for more than half of his life).  We, therefore, find no abuse of the trial court's discretion in terminating the parental rights of Parents under section 2511(b).

In their second argument, Parents assert that CYS deprived Father of his constitutional guarantee to due process of law because CYS failed to provide reasonable services to reunify Parents with Child.  Brief for Parents at 10.  Parents argue that Father was required to complete certain sex offender services as a prerequisite to reunification or even visitation with Child, but neither CYS nor the court permitted funding for such services.  *Id.* at 11.  Parents claim that their parental rights could not be terminated because the Agency obviously had no intention of reunifying Father with Child, and prematurely filed the Petitions to terminate parental rights.  *Id.* In support of their argument, Parents cite *In re D.C.D.*, 91 A.3d 173 (Pa. Super. 2014), which held that an agency must first make reasonable efforts to reunify a parent with his or her child before filing a petition to terminate parental rights.  Brief for Parents at 10.

- 16 -

Parents' reliance on this Court's decision in **D.C.D.** is misplaced, as our Supreme Court reversed that decision. **In re D.C.D.**, 105 A.3d 662 (Pa. 2014). Our Supreme Court has held that neither section 2511(a)(2) nor section 2511(b) requires a court to consider, at the termination stage, whether an agency provided a parent with reasonable efforts aimed at reunifying the parent with his or her child prior to the agency petitioning for termination of parental rights. **Id.** at 672. Considering the substantive due process interests of parents, the Court concluded that the Adoption Act, and the clear and convincing standard, is sufficiently tailored to protect a parent's fundamental rights while also ensuring the safety and permanency needs of dependent children. **Id.** at 673-77. Thus, Parents' second claim is without legal support and lacks merit.

Accordingly, we affirm the trial court Decrees terminating the parental rights of Mother and Father.

Decrees affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/6/2016

- 17 -